Robert E. DAVIS, Plaintiff,

v.

John H. DALTON, Secretary of the United States Navy,

and

The United States Navy,

and

Bureau for the Correction of Naval Records

and

The Office of Personnel Management, Defendants.

Civil Action No. 95–01631.

United States District Court, District of Columbia.

June 6, 1996.

Mark Charles DelBianco, Schagrin Associates, Washington, DC, Sonia Renee Jarvis, Washington, DC, for Robert E. Davis.

Robert E. Davis, Lorton, VA, pro se.

Michael Thomas Ambrosino, Kristan Lizabeth Peters–Hamlin, U.S. Attorney's Office, Washington, DC, for John H. Dalton.

**MEMORANDUM OPINION**

SPORKIN, District Judge.

This matter comes before the Court on defendants' motion to dismiss or, in the alternative, for summary judgment. Plaintiff, who was involuntarily retired from the Unit-

ed States Navy in September 1995, seeks reinstatement and the opportunity to have an unbiased hearing before an impartial board to determine whether he should be promoted to Captain. Plaintiff alleges he was made the subject of a racially-motivated cabal—which employed among other things the punitive use of involuntary psychiatric confinement and diagnosis—designed to drive him out of the Navy despite his exemplary career and long record of service to his country. Because plaintiff has presented facts sufficient to suggest that his Constitutional rights might have been violated, the Court will deny defendants' motions.

## BACKGROUND

Involuntarily retired Commander Robert E. Davis, the plaintiff in this action, began his service to his country more than 35 years ago when he enlisted in the United States Navy at the age of 18. Through hard work and a series of early promotions, Commander Davis rose through the ranks. While serving in the Navy, plaintiff, an African–American, attended night school and earned a Bachelor's degree from San Diego State University,[1] and three separate Master's Degrees. In 1971, some eleven years after his enlistment, plaintiff was promoted to the rank of Warrant Officer, a non-commissioned officer position. Three years later, skipping the position of ensign, plaintiff entered the officer ranks as a lieutenant junior grade. Commander Davis was then selected for early promotion to Lieutenant Commander and subsequently to Commander. Plaintiff received numerous achievement awards and service medals. By all accounts, Commander Davis had an exemplary record of public service and personal accomplishment until 1991 when he came under the command of a certain Captain.[2]

While plaintiff was serving as the Commanding Officer ("CO") of the Navy's communication facility in Yokosuka, Japan, his supervisor told him that his performance was being reevaluated in light of certain allegations against him. The allegations—which included security violations, sexual harassment, reverse discrimination, and voyeurism [3]—had surfaced during a routine background investigation to determine plaintiff's suitability for a top secret clearance and access to sensitive compartmented information ("SCI") and as a result of an anonymous hotline tip.

Although Commander Davis was ultimately cleared of these charges in a special court martial, the allegations set off an almost "kafkaesque" series of events which included: (1) involuntary confinement in a mental hospital for three weeks; (2) revocation of plaintiff's security clearances; (3) removal of plaintiff from his position of command; (4) initiation of "detachment for cause" proceedings against plaintiff; and (5) institution of a Medical Board against plaintiff. Ultimately, plaintiff was denied promotion to Captain and was involuntarily retired from the Navy he had served so well.

After completion of several investigations into the allegations against Commander Davis, plaintiff's supervisor informed the Chief of Naval Personnel on January 23, 1992, that she had lost confidence in Commander Davis's ability to command. Shortly thereafter, the Naval Intelligence Command recommended that plaintiff be declared ineligible for access to SCI. In late February, plaintiff was ordered to leave his post in Japan and to report to the Psychiatry Clinic at the Bethesda National Naval Medical Center ("Medical Center") for a full psychological evaluation, to be conducted by a specified physician. Prior to the evaluation, the examining physician received derogatory informa-

---

**1.** The Navy allowed Commander Davis to attend college full-time for one year.

**2.** Plaintiff's supervisor was subsequently promoted to Rear Admiral.

**3.** Certain portions of the administrative record call into question whether the alleged incident of voyeurism ever occurred. *See* Exh. 1 to Plaintiff's Opposition to Defendants' Motion to Dis-

miss or, in the Alternative, for Summary Judgment ("Plaintiff's Opposition"), Administrative Record ("AR") VI 186. Regarding the alleged security violations, plaintiff ultimately passed a polygraph examination on the issue. The substance of the sexual harassment charges involved comments of a sexual nature plaintiff allegedly made to a junior officer. No physical touching, assaultive behavior or retaliation against the junior officer was ever alleged or proven.

tion about plaintiff from his supervisor's JAG Officer.

After a preliminary evaluation and diagnosis, the psychiatrist ordered that plaintiff be admitted to the hospital for an estimated 21 days of psychiatric treatment and care.[4] If Commander Davis had left the hospital without being discharged, he could have been charged with being Absent Without Leave. During his three-week involuntary confinement, medical personnel attempted to medicate plaintiff and to perform a lumbar puncture, but plaintiff was able to thwart these attempts.

While plaintiff was confined at the Medical Center, his supervisor utilized a Navy regulation which allows a CO to be temporarily replaced if that CO is away from his duty station for four weeks, regardless of the cause of the absence. His supervisor also initiated a procedure against plaintiff known as "detachment for cause" ("DFC"). A DFC allows a superior officer to request removal of a junior officer from command permanently if the superior officer has lost confidence in the junior officer's ability to command.[5]

On March 20, 1992, a Medical Board diagnosed plaintiff as having among other things "Bipolar disorder, Manic Episode, with mood-incongruent psychotic features ..." and concluded that plaintiff was not competent to return to full duty. The Board also recommended that plaintiff's case be referred to the Central Physical Evaluation Board for disability proceedings. However, these proceedings were held in abeyance pending the outcome of the disciplinary actions begun against Commander Davis.

Two neurological and psychiatric examinations by civilian physicians from the National Institutes of Health directly contradicted the Medical Board's diagnosis. The private psychiatrist found that plaintiff did "not suffer from any significant mental disorder that would render him unfit for duty." The private neurologist indicated that plaintiff had "an entirely normal neurologic exam." Based on these findings, Commander Davis challenged the Medical Board's conclusions, but the Medical Board upheld its original diagnosis.

On April 9, 1992, plaintiff's supervisor's deputy recommended that plaintiff be nonjudicially punished pursuant to Article 15 of the Uniform Code of Military Justice, 10 U.S.C. § 815. Plaintiff refused the nonjudicial punishment, as was his right to do, and elected instead to face a court martial.[6] Thereafter, plaintiff's supervisor requested an inquiry into whether plaintiff lacked the mental responsibility for the offenses charged or, in general, lacked the mental capacity to stand trial. A Board conducted by two psychiatrists found that plaintiff had the mental capacity to be charged with the offenses and to stand trial.

Also in April 1992, plaintiff was notified that he was no longer eligible for access to SCI and that his security clearances would be revoked. Plaintiff appealed both decisions. On June 9, 1992, the Director of the Navy's Central Adjudication Facility decided

---

4. The parties dispute the length of the pre-admission testing performed on plaintiff. Both parties agree that plaintiff was evaluated on an outpatient basis for two to three hours on February 25, 1992. Defendants state that plaintiff received additional outpatient psychodiagnostic testing on February 26–27, 1992. Plaintiff contends that the only evaluation he underwent prior to being involuntarily confined was the evaluation on February 25, 1992. The parties also dispute Commander Davis's freedom of movement during his stay at the hospital. Defendants claim that plaintiff was given permission to leave the hospital on day passes to take care of personal business. Plaintiff states that his request for such permission was disapproved.

5. According to the Naval Military Personnel Manual, a DFC "is the administrative removal of

an officer ... from his or her current duty assignment before the planned rotation date. ... DFC is one of the strongest administrative measures used in the case of officers. ... [A] DFC has a serious effect on the officer's future naval career, particularly with regard to promotion, duty assignment, selection for schools and special assignment. The initiation of a DFC, therefore, should be undertaken with full appreciation of its gravity." Naval Military Personnel Manual § 3410105.

6. Although the potential penalties may be higher as a result of a court-martial than nonjudicial punishment, a court-martial affords the accused several important rights, including the right to cross-examine witnesses, to have a trial by jury, and to rely on the Military Rules of Evidence.

against revoking plaintiff's security clearance and granted plaintiff a Top Secret clearance. Despite two appeals and a legal review of the procedural protections afforded plaintiff, the denial of plaintiff's access to SCI was affirmed. This decision was based at least in part on the original allegations.

On May 8, 1992, the Chief of Naval Operations ("CNO") upheld the DFC initiated against Commander Davis. During all of these actions taken against plaintiff, Commander Davis had been forced to leave his family in Japan. He was not able to see them for more than six months.

On September 17, 1992, after a two-day jury trial, Commander Davis was acquitted by a special court-martial of all thirteen charges and specifications made against him. On October 13, 1992, the Chief of Naval Personnel disapproved the DFC request initiated by his commanding officer. So by the middle of October 1992, Commander Davis had been cleared of all charges against him.

Despite Navy regulations requiring that Commander Davis be returned to command as soon as practicable and that his career be normalized, plaintiff was not returned to command but was instead ordered to a new assignment. In addition, plaintiff's former supervising officer in Japan filed an adverse fitness report against Commander Davis in October 1992. This was the first adverse fitness report Commander Davis had received in his entire career. Although Commander Davis had been fully exonerated of the charges against him, the report repeated the old allegations.

On December 1, 1992, the Selective Early Retirement Board ("SER Board") identified Commander Davis for involuntary early retirement, scheduled for August 1, 1993. At the time the SER Board reviewed plaintiff's record, the adverse fitness report and two negative documents relating to the revocation of plaintiff's SCI access were in plaintiff's official military personnel file.

Commander Davis pursued several means to challenge the adverse actions against him. He asked the Chief of the Bureau of Medicine and Surgery to intervene to terminate his pending Medical Board and to declare him fit for duty. In early March 1993, plaintiff underwent a complete psychiatric reevaluation at the Walter Reed Army Medical Center. The two psychiatrists who conducted this examination concluded that plaintiff did not have any psychiatric problems which would "impair his ability to function on active duty in the military." The psychiatrists also concluded that there was no evidence that Commander Davis had, or indeed ever had, bipolar disorder.

Plaintiff also filed a "Complaint of Wrongs" against his former supervisor, claiming that the adverse fitness report was unfair in light of his acquittal by the special court-martial. After investigating plaintiff's complaint, the Chief of Naval Personnel ("CNP") concluded that plaintiff's former supervisor had abused her discretion with respect to Commander Davis. Specifically, the CNP found that plaintiff's former supervisor had "a preconceived notion of [plaintiff's] guilt" and persisted in persecuting plaintiff despite his having "been exonerated whenever he ha[d] received an impartial hearing." The CNP stated that plaintiff's former supervisor had engaged in "a pattern of discrimination against minorities" and concluded that the supervisor had "abused her authority in [plaintiff's] case, and redress should be granted."

The CNP also found that the medical board then pending against Commander Davis had been tainted by the psychiatrists' receipt of the investigation reports and by their continuing contact with the JAG officer for plaintiff's former supervisor. The CNP noted that plaintiff's "health record contains numerous entries about Commander Davis's refusal to acknowledge being guilty of acts he was later acquitted of at the [special court martial]."

On April 14, 1993, the CNO acted on Commander Davis's complaint. The CNO found that the comments in plaintiff's fitness report "inappropriately address[ed] prohibited information, were . . . used as an alternative to proper disposition of allegations of misconduct, and circumvent[ed] the findings of 'not guilty' at a special court-martial." Accordingly, in May 1993, the improper adverse fitness report was removed from Commander

Davis's personnel file. Because the fitness report had influenced the decision of the SER Board to select plaintiff for early retirement, the Secretary of the Navy removed plaintiff's name from the early retirement list.

When plaintiff was considered for promotion in January 1994, he was passed over and scheduled to be involuntarily retired from the Navy by August 31, 1995. Commander Davis subsequently learned that one of the officers who sat on his promotion board had also been a member of the SER Board whose recommendation for plaintiff's early retirement had been overturned. In addition, at the time plaintiff's case was before the promotion board, plaintiff's personnel file improperly contained the two negative documents regarding revocation of his SCI access.

Because of the above, Commander Davis appealed his non-selection for promotion to the Board for Correction of Naval Records ("BCNR"). As a result of this appeal, the two letters concerning denial of SCI access were removed from plaintiff's file, and plaintiff's corrected record was to be considered at the next regularly scheduled selection board. Plaintiff was to be considered for promotion to Captain in an "in-zone" status, i.e. as if he had not previously been denied promotion. In recommending this relief, the BCNR noted that the presence at his promotion board of a member of the SER Board who had seen the adverse fitness report was "an injustice of such magnitude as to render the proceedings fundamentally unfair."

Meanwhile, Commander Davis had been transferred to serve under a new superior officer and had received exemplary fitness reports for 1993 and 1994. Although Commander Davis had been ranked in the top one percent and recommended for early promotion in all eleven of plaintiff's relevant fitness reports, he was not promoted. Despite Commander Davis's 35 years of exemplary service, he was involuntarily retired on September 1, 1995, pursuant to 10 U.S.C. § 6383.

Commander Davis submitted a petition for relief to the BCNR, requesting that he be reinstated and that a special selection board be convened to consider him for promotion to Captain. He stated that his prior promotion board was unfair because he was considered in an "above-zone" status (i.e. as if he had been previously passed-over for promotion), which put him at a disadvantage. Plaintiff maintains that the decision not to restore him to command doomed his chances for promotion by making him no longer competitive with his peers. The BCNR denied plaintiff's petition, and the decision was upheld on January 11, 1996, by the designated representative of the Secretary of the Navy.

In this action, plaintiff alleges that defendants' discriminatory actions and failure to follow applicable Navy regulations constitute a violation of the due process, equal protection and double jeopardy clauses of the Fifth Amendment to the United States Constitution. Commander Davis further asserts that the revocation of his SCI access was arbitrary and capricious and that defendants' failure to correct his service record concerning his medical status and SCI access violates the Privacy Act, 5 U.S.C. § 552a *et seq.* Plaintiff asks this Court to: (1) order BCNR to correct his service records by removing any reference to his medical status and his SCI access; (2) order that Commander Davis be reinstated to active duty in the Navy or, alternatively, that the Navy convene a Selective Retention Board to consider Commander Davis's case; and (3) order the BCNR to convene a special selection board to consider Commander Davis for promotion.

## SUMMARY JUDGMENT STANDARDS

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Mere allegations or denials of the adverse party's pleadings are not enough to prevent issuance of summary judgment. The adverse party's response to the summary judgment motion must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e).

472

The Supreme Court set forth the governing standards for issuance of summary judgment in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Celotex,* the Supreme Court recognized the vital need for summary judgment motions to the fair and efficient functioning of the justice system:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Pro. 1 . . .
>
> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555 (citation omitted).

The moving party is entitled to summary judgment where "the non-moving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex* at 323, 106 S.Ct. at 2552. Any factual assertions contained in affidavits and other evidence in support of the moving party's motion for summary judgment shall be accepted as true unless the facts are controverted by the non-moving party through affidavits or other documentary evidence. See Local Rule 108(h).

In resolving the summary judgment motion, all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). The inferences, however, must be reasonable, and the non-moving party can only defeat a motion for summary judgment by responding with some factual showing to create a genuine issue of material fact. *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993). The non-movant has met its burden of showing that a dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party". *Laningham v. U.S. Navy,* 813 F.2d 1236, 1241 (D.C.Cir.1987) *(per curiam) (citing Anderson, supra).*

## DISCUSSION AND DECISION

While there is substantial agreement between the parties about what happened to derail Commander Davis's career, the parties dispute whether the defendants' action were proper or whether they were impermissibly motivated by racial or personal animus. Plaintiff alleges that these actions were done with the express purpose of harassing him and driving him out of the Navy. In short, Commander Davis alleges that there was concerted action against him in which several of his superiors embarked on a course of conduct which included: (1) having Commander Davis involuntarily confined for three weeks in a psychiatric ward; (2) giving Commander Davis a psychiatric diagnosis not supported by the facts; (3) taking improper administrative and disciplinary actions against Commander Davis such as instituting a detachment for cause and a special court martial, denying security clearance and writing an adverse fitness report; and (4) ultimately wrongfully discharging Commander Davis from the Navy.

The Navy has offered nonconvincing explanations for all of these actions. Taking the actions together and viewing, as we must, the facts and the inferences in the light most favorable to the plaintiff, the actions suggest that defendants engaged in a practice of racial discrimination and harassment in violation of plaintiff's Constitutional rights. At the very least, plaintiff has presented sufficient facts to give him standing to pursue and further develop his claims.

Plaintiff, a minority officer who came up from the ranks, had an exemplary and unblemished record during more than 30 years of service to his country. Then, at the peak of his career—while under the command of an officer with an alleged bias against plain-

tiff and other minorities—plaintiff was subjected to a bizarre series of events. These events, beginning with serious allegations against plaintiff of which he was later fully exonerated, led to Commander Davis's involuntary retirement from the United States Navy with a cloud over his reputation, honor, and even his mental stability. Even after plaintiff prevailed in a court martial, he was not restored to command and thus was unable to salvage his career.

We do not know if plaintiff's allegations of discrimination are true. What we do know is that if plaintiff's allegations are sustained he has been subjected to repeated indignities that no one—let alone a highly decorated officer who has dedicated over three decades of his life to his nation's service—should be forced to endure. To grant defendants' motion for summary judgment on the basis of this record would be doing an injustice not only to plaintiff but also to the Constitution and the laws of this land.

The military, of course, has great discretion and broad latitude with respect to personnel and promotion decisions. But, like any other institution in this country, the Navy is subject to the Constitution, the laws of this nation and to its own rules and regulations. The Navy's discretion is not so broad as to allow it to do away with Constitutional protections or to selectively ignore its own regulations. The CNP's finding that plaintiff's supervisor engaged in a pattern of discrimination against minorities coupled with the alleged improper actions taken against plaintiff are more than enough to allow plaintiff to pursue his claims.

For the reasons stated above, defendants' motion for summary judgment will be denied and the case will proceed to trial. An appropriate Order accompanies this Memorandum Opinion.